CENTRAL TRUST CO. OF NEW YORK v. CINCINNATI, J. & M. RY. CO.

(Circuit Court, N. D. Ohio, E. D. November 1, 1892.)

No. 975.

**1. RAILROAD FORECLOSURE—SALE—ENFORCEMENT OF TERMS AGAINST BIDDERS.**
   A reorganization committee, to whom a cash sale of the road is made and confirmed, and who fail to make good their bid, not for want of funds, but because they think the price too high, cannot be excused, on a resale of the property for a less price, from making good the difference, if the unsecured creditors will be benefited thereby. Camden v. Mayhew, 9 Sup. Ct. 246, 129 U. S. 73, followed.

**2. SAME—REORGANIZATION AGREEMENT—RIGHTS OF BONDHOLDERS.**
   When a reorganization agreement to which all the bondholders and stockholders of the mortgagor company are parties plainly shows an intention that the new securities to be issued after the purchase of the road at judicial sale shall extinguish the old bonds for which they are to be exchanged, the consummation of the plan operates as a payment of the old

---

bonds, and the former holders thereof have no claim upon the proceeds of the sale, on the theory that they are to be regarded as unsecured creditors to the amount by which the sum realized falls below the amount of such bonds.

**3. SAME.**

Judgment creditors who had advanced money to the railroad company, and who were included in the reorganization agreement on the same basis as the bondholders, were in a like position after the completion of the scheme by the delivery of the road to the new company, and their claims also must be considered as paid.

**4. SAME—DISTRIBUTION OF PROCEEDS—PAYMENTS BY NEW COMPANY.**

Where a reorganized railroad company purchases and receives possession of the road, and thereafter pays certain taxes, and also indebtedness incurred by the receiver, without especial authority from the court, these payments cannot be regarded as loans to the receiver, to be reimbursed from the proceeds of the sale.

**5. SAME—RIGHTS OF UNSECURED CREDITORS—WAIVER.**

When, by the conditions of a railroad foreclosure sale, the court has required the payment in cash of an amount which is sufficient to meet all allowed claims and the expenses of the suit, (the rest being paid in bonds,) the subsequent application, by consent of all parties, of part of this money to liabilities not properly chargeable against it, is a waiver by the owners of allowed claims of their rights to the extent that such appropriation reduces the ability of the fund to discharge their entire claims with interest, and they cannot afterwards require the purchasers to substitute sufficient cash in lieu of bonds to pay their claims in full.

**6. RECEIVERS—COMPENSATION.**

A railroad receiver, who resides at a distance from the property, and commits its active management to others, is not entitled to the full compensation usually paid to railroad presidents and receivers who are the active executive heads of going railroads.

In Equity. Bill to foreclose a railroad mortgage. Heard on questions as to distribution of the proceeds of sale.

Butler, Stillman & Hubbard, for complainant.

Swayne, Swayne & Hayes and R. G. Ingersoll, for receiver.

Robert G. Ingersoll, for Wm. Stewart Tod.

A. L. Smith, E. D. Potter, Jr., and J. L. Price, for intervening creditors.

Before TAFT, Circuit Judge, and RICKS, District Judge.

TAFT, Circuit Judge. Complainant exhibited its bill praying for foreclosure of two mortgages upon the property of the Cincinnati, Jackson & Mackinaw Ry. Company, and a sale of the road. Decrees of foreclosure and sale have been passed, the entire corpus of the defendant company has been sold, and the sale confirmed. The questions now to be decided arise upon distribution, and are presented on two motions to that end, made by certain intervening judgment creditors, whom we may shortly call Schaffer et al. The defendant company was a consolidation of the Jackson & Ohio Railroad Company, owning and operating a road running from Michigan into Ohio, and the Cincinnati, Van Wert & Michigan Railroad Company, whose road lay wholly within Ohio. These constituent parts we shall call hereafter, the one the Jackson Division, and the other the Van Wert Division. Before the union, the Van Wert road had placed two mortgages on its property; the first

to secure an issue of bonds amounting in round numbers to $1,150,-
000, and the second to secure an issue of income bonds of which
there were outstanding at the foreclosure $363,000. After the
union, the new company issued a mortgage to secure bonds amount-
ing to more than $2,000,000. This mortgage covered its whole
road, including the Van Wert Division, but its lien on that divi-
sion was, of course, subsequent to that of the two mortgages above
stated. The two divisions of the road were, by order of court,
sold separately. At the first sale of the Jackson Division it was
struck off to the reorganization committee of bondholders and stock-
holders of the defendant company at their bid of $2,525,000, to
secure the completion of which they deposited $25,000. The Van
Wert Division was struck off to A. V. Rice and associates at $1,640,-
000, and $15,000 was deposited as security. After obtaining one
or more extensions, both purchasers declined to complete their
bids. A resale was ordered, and the reorganization committee bid
in both divisions; the Jackson Division at $2,250,000, and the Van
Wert Division at $150,000. On motion Rice's deposit of $15,000,
less the expenses of the first sale, was returned to him by order of
the court.

The first motion of Schaffer et al. is for an order requiring the
committee of reorganization to pay into court $250,000, which, with
their deposit of $25,000, already in the registry of the court, would
make up the difference of $275,000 between their first and second
bids for the Jackson Division. The committee still hold $150,000
of first mortgage bonds applicable to the purchase price under the
decree for sale, and the effect of the order asked, therefore, would
be to require a further payment of $100,000 in cash.

The second motion is for distribution of this fund to pay the
judgments of Schaffer et al., aggregating $18,000.

If there are no other creditors of the road entitled to share in
this distribution, it is apparent that the fund of $25,000 already in
court will suffice to pay Schaffer et al. in full, and the order upon
the committee, moved for, need not be made.

As to the first motion, the committee contend that, not only
should they not be required to make up the deficiency on the re-
sale of the Jackson Division, but that the deposit of $25,000 al-
ready made should be returned to them. They urge that, as Rice
was relieved from the loss of his deposit on his default, the same
measure of mercy ought to be extended to them. We are of the
opinion that the circumstances of the Rice bid and the bid of the
committee are very different. None of the parties resisted Rice's
motion. He made his bid to secure himself and associates from
severe losses arising from their investment in the original con-
struction of the road. He made it with the reasonable hope that
he might be able to complete it, but he failed only from lack of
funds. The committee failed to complete their first bid, not from
want of funds, but because they concluded that the price they had
contracted to pay was too high. They had not made as good a
bargain as they could make if they were given a second chance.

We do not see anything in the situation that appeals strongly to the mercy of the court, and we do not see why, if unsecured creditors will derive advantage from the contract of purchase which the authorized representative of the committee deliberately made, the court ought not to fully enforce it for their benefit. Nor is there any doubt in regard to the power of the court to do so. The supreme court of the United States, in the case of Camden v. Mayhew, 129 U. S. 73, 9 Sup. Ct. 246, decided that:

"When a decree of a court of equity for the sale of a tract of land requires the sale to be made upon the terms 'cash in hand upon day of sale,' and the person bidding for it at the sale is the highest bidder, and as such is duly declared to be the purchaser, no confirmation of the sale by the court is necessary to fix liability upon him for the deficiency arising upon a resale in case he refuses without cause to fulfill his contract, and, if the purchaser refuses to pay the amount bid, the court, without confirming the sale, may order the tract to be resold, and the purchaser shall pay the expenses arising from the noncompletion of the purchase, the application, and the resale, and also any deficiency in the price in the resale."

We have at bar a stronger case than the one cited, for here the sale was confirmed. The sale was what is known as a cash sale, though the cash was not to be paid on the day of sale; but this difference does not affect the application of the principle laid down by the supreme court. If there are any creditors whose claims have not been paid, they are entitled, therefore, to an order upon the reorganization committee, or their successor, the company now in possession of the road, requiring the payment into court of the deficiency in the resale.

As to the motion by Schaffer et al. for distribution, the point at issue between them and the reorganization committee is whether the latter, as holders of all the first mortgage bonds on the Van Wert Division, may share in the distribution as unsecured creditors to the extent of $1,000,000, the difference between $1,150,000, the face of their bonds, and $150,000, the proceeds of sale of their mortgage security. The consolidated company, by the union, of course assumed the payment of the Van Wert bonds; and, unless these bonds have been paid or extinguished, the claim of the committee would seem to be well grounded. If so, the amount to be received by Schaffer et al. on their judgments will be inconsiderable. They maintain that the claim of the committee in this behalf cannot be sustained, because by the carrying out of the reorganization plan and agreement, to which all the Van Wert first mortgage bondholders were parties, their bonds were fully satisfied as against the old company. Here is presented the chief point of discussion on these motions: Has the execution of the reorganization plan under the agreement extinguished the bonds of those who accepted its benefits? The plan and agreement were made before the foreclosure proceedings, but the details of the plan were somewhat modified from time to time. The plan was that the road should be bought in by the committee at the foreclosure sale, a new company organized, (if necessary,) and that new securities be issued to "take up" the old securities. The details of the plan

finally adopted and carried out, as stated in a circular of the committee, were as follows:

"The holders of the present bonds shall receive, dollar for dollar, of the new bonds, for principal and interest, being calculated at four per cent. from payment of last coupon; and the old stockholders shall receive of the new stock in exchange for the old, share for share, upon the payment of one per cent. on the common stock and three-quarters of one per cent. on the preferred stock, payable by the holders on deposit of said stock or present certificates with the Central Trust Company of New York for the purpose of exchange."

"Eight hundred thousand dollars of said bonds shall remain in the treasury of the company for future additions to and improvements of the property, and for the purchase of additional rolling stock as required. The $4,000,000 will be issued and delivered to the reorganization committee, and used by them to carry out the terms of the reorganization agreement."

It was also provided that the income bondholders were to receive the stock of the new company in exchange for their bonds, share for bond, without the payment of any assessment. The agreement, after reciting the plan, went on to define the duties of the subscribers thereunder, and the authority and powers of the committee essential to its execution.

The agreement provided that the owners of bonds and stock should deposit them with the Central Trust Company for account of the committee, and accept "in lieu thereof" negotiable certificates of deposit; that they should in all cases execute transfers, so that the legal title of the bonds and stock should be vested in the committee for the use of the committee, and subject to their control. The plan of reorganization is approved of in the agreement, and the committee are constituted the trustees and agents of the subscribers to carry it out. The committee are given power to enforce foreclosure proceedings, to act for the subscribers in all meetings of stockholders and bondholders, and institute all necessary legal proceedings; "to approve, secure, control, pay over, surrender, and otherwise dispose of" the bonds and stock deposited with them, "and all rights, privileges, property, and interest therein represented, or pertaining thereto, in furtherance of any reorganization; to receive and receipt for so much of the proceeds of any sale or sales of the whole or any part of the property covered by or included in the said mortgages as may pertain to the securities deposited hereunder, and thereon to cancel, surrender, or reduce said securities, or any part thereof, therefor." The committee is further given power to secure the sale of the road as a whole or in blocks, as may seem best, and to purchase such parts as they deem proper, or the whole of it, at public or private sale, at such prices as the committee deem proper for the protection of the subscribers; and "to hold the property purchased either in their name or in the name of persons chosen by them," and to apply the securities deposited with them in satisfaction of any such bid, according to their discretion, and to borrow money either on a pledge of the securities deposited or of the property purchased, for such an amount as they may require pending reorganization. The committee are given power to take the deed of such parts of

the road as they purchase, or, "if any part should be purchased by others, the committee and trustees may receive the distributive share due on the securities held by them out of the proceeds of such sale, and distribute the same according to the rights of the parties hereto, less their pro rata share of all expenses incurred" under the agreement.

All the first mortgage bondholders of both the Jackson and Van Wert Divisions have signed the agreement, as well as all the stockholders of the old company. The holders of $152,000 of the Van Wert income bonds out of $363,000 have also signed. A new company has been organized to take the road and issue the securities, and those securities have been issued.

The argument on behalf of the committee is that the defendant company, which owes the amount of the bonds, was not a party to the agreement, and therefore that the benefit accruing to the bondholders thereunder could not inure to the benefit of the company. The bondholders and stockholders, it is said, had a right to purchase, and, having purchased, had a right to make such an agreement among themselves as seemed best to them in regard to the division and incumbering of the property. The company, by the sale, had been lawfully divested of all ownership and further interest in the railroad, and must depend alone on the proceeds of sale to pay its debts. As between the company and the holders of the Van Wert bonds, it is said the former can take no benefit from the fact, if it be a fact, that the bondholders have made a fortunate investment in their purchase. The argument is plausible, but it does not meet the real point of the case made by Schaffer et al., which is that it was the intention of the bondholders and stockholders subscribing the agreement, as evidenced by the terms of the plan and agreement, that when the new bonds were delivered for the old, the old bonds should be considered paid and extinguished. It is immaterial whether the old company was a party to the reorganization agreement or not, if in fact the subscribers intended to extinguish the obligations of the company and have done so. It is well settled, both in the federal courts and in the courts of Ohio, that in certain cases two parties to a contract may stipulate for the benefit of a third person, a stranger to the contract; and that the third party may sue thereon, to recover the benefit inuring to him. See Hendrick v. Lindsay, 93 U. S. 143; Emmitt v. Brophy, 42 Ohio St. 82. By an analogous principle it has been held that, where a stranger pays to the holder of a note the amount due on it, intending thereby to pay it, the debt is extinguished, and the maker may have the benefit of it. In Dodge v. Trust Co., 93 U. S. 379, it was held that where a stranger paid the amount of a note in bank for collection, the question whether his act was a payment of the note or a mere purchase of it was one of intention. The same rule has been applied to the payment of judgments. Harbeck v. Vanderbilt, 20 N. Y. 395. In Wood v. Safe-Deposit Co., 128 U. S. 416, 9 Sup. Ct. 131, where coupons on negotiable bonds were taken up by an officer of the company which

had issued them, with his own money, it was said that the question of whether the coupons were paid or still remained as a lien upon the property which originally secured them was a question of the intention of the officer who took them up, and from the facts and circumstances of that case the court found that the officer did intend to pay them, and that the coupons were extinguished. In Ketchum v. Duncan, 96 U. S. 659, the circumstances were such that the court, in applying the same principle, found that the stranger had not intended to pay the coupons, but to buy them.

In the case at bar we have the subscribing stockholders and bondholders pooling their securities for the purpose of buying the old road and reorganizing and agreeing among themselves that in exchange for their old securities they would receive securities to be issued by the new road. If now, from the agreement and circumstances of the case, we can infer that they intended thereby to wipe out and extinguish the old securities, we can properly hold, on the principle of the cases cited, that the old bonds were absolutely paid. Taking up the plan and agreement by the four corners, we have not the slightest doubt that it was the intention of the parties, if the plan was successfully carried out, the old road purchased, and transferred to the new corporation, and the new securities issued, that the old bonds should be considered extinguished. The plan in its entirety has been successfully carried out, and the result of payment follows.

Great stress is laid by counsel for the committee upon the powers of the committee over old securities deposited with them as evidence that it was not the intention of the subscribing bondholders that under the agreement their bonds should lose their character as living obligations of the old company. By the agreement the title to the bonds before the purchase was to vest in the committee as trustee, to enable them to carry out the plan of reorganization, and to that end, with a wealth and redundancy of verbiage, every power that could be suggested with reference to those old securities was conferred upon the committee. They were given the power to pledge the old securities, and to raise money on them, and to use them in the purchase of the road, or to dispose of them in any other way in furtherance of the plan. But why should this show that, after the plan was carried out, the bonds were not to be considered paid? It is, of course, true that pending its execution the bonds were not extinguished. On the contrary, they were the very instruments with which the committee were to do the work. Payment of them was to follow only after the road had been bought, and the new securities issued.

Nor does the power to receive the proceeds of sale given to the committee have any application to the present condition of affairs, now that the committee own the whole road. It was not certain that the committee would find it best to buy the whole road, and thus carry out the plan in its entirety. The committee were given the discretion to petition the court for a sale of the road in blocks,

and to buy such blocks as they deemed best. If the road had been sold in blocks, and the committee had bought some of the blocks, and other purchasers had bought other blocks, the proceeds of the latter would probably have been applied to reduce the first mortgage bonds. Or, if the road had, all of it, gone to other purchasers, there would have been nothing to do but to receive the proceeds in exchange for a surrender of the bonds, and to distribute the money among the bondholders. It is to such contingencies that we must apply the words of the agreement—so much relied on by counsel for the committee—in which power is given to the committee "to receive and receipt for so much of the proceeds of any sale or sales of the whole or any part of the property covered by or included in the said mortgages, and thereon to cancel, surrender, or reduce said securities, or any part thereof, therefor." This becomes quite apparent when the same power is referred to in another part of the agreement, where the duty of the committee towards the various bondholders is set forth. There it is said:

"And in case the committee and trustees do not purchase the said properties, or every portion thereof, or if any portion of it should be sold to others, the committee and trustees may receive the distributive share due on the securities held by them out of the proceeds of such sale, and distribute the same according to the rights of the parties hereto, less their pro rata share of all expenses incurred hereunder."

The power to receive the proceeds of sale thus given is, therefore, not at all inconsistent with an intention on the part of the subscribers to the agreement that in case that and after the committee purchased the entire road, the old bonds should be extinguished by the issue of the new bonds, in accordance with the plan. It was not in the contemplation of the parties that if they purchased the whole property of the defendant road there would be any proceeds of sale to be distributed among them. Counsel for the committee concede this, and that it is manifestly true can be inferred from the embarrassment that would attend the disposition, under the agreement, of any part of this $125,000, if it is to be received back by the reorganization committee by virtue of their title to the Van Wert first mortgage bonds. How is it to be divided? If the language referred to is to have the meaning urged on behalf of the committee, then this fund goes to the Van Wert bondholders. It will therefore follow that, because their mortgage security only realized the nominal sum of $150,000, they obtain greater benefit from the foreclosure and sale and the reorganization agreement than the Jackson Division first mortgage bondholders, whose security sold for more than their mortgage bonds. Plainly, the parties to the agreement intended no such paradoxical result.

All the stockholders were parties to the reorganization agreement. As stockholders in the old company, they would be liable to the Van Wert bondholders for this deficiency, amounting to $1,000,000, on the Van Wert bonds. Can the Van Wert bondholders, or the committee of reorganization for them, enforce this liability? It is conceded by counsel for the committee that they cannot. If not, why not? The only reason is that the bondhold-

ers under the agreement have impliedly agreed with the stockholders that the new securities which they have received, extinguish their debt. Counsel for the committee say:

"We think it is true that the bondholders could not sue the stockholders, parties to the reorganization agreement, upon their individual liability, but not by reason of the fact that the issue of new bonds was to be a payment of the bonds of the old company, but for the reason that the rights of the holders of the bonds and the stockholders became merged in the bonds and stock deposited with the trustee in carrying out the agreement, so that they were held for the equal benefit of both; and the trustee would manifestly have no power to use them in any way which would be to the detriment of any of the cestuis que trustent."

We do not see that counsel avoid the difficulty by this explanation. It is as much as to say that the stockholders and bondholders, as between themselves, agreed to look to the plan of reorganization alone for the satisfaction of their claims; in other words, that as against all the stockholders of the company the delivery of the new securities for the old would be payment of the old. But, if payment as to the stockholders is to be inferred, why may we not also infer an intention to pay absolutely? The well-understood purpose of every reorganization agreement of this kind, when entered into by all the stockholders and all the bondholders, is to wipe out all the obligations, and readjust the debts and interests between the creditors and stockholders. The bondholders thereby agree, in effect, to look to the corpus of the railroad alone for the payment, and accept the new mortgage debt of that corpus in lieu, i. e. in payment, of the old.

The Van Wert road went to the reorganization committee for $150,000. This was the lowest price fixed in the decree for sale. Presumably the court would not have confirmed the sale for this price, except to the representative of the holders of the first mortgage bonds, amounting to $1,150,000. Sold to them, it was practically immaterial whether they paid $150,000 or $1,150,000. The price given was plainly inadequate, except under the circumstances stated; and it would be inequitable for this court, if it can avoid it by applying any legal principle, to permit the inadequacy of the price paid by the purchasers to enable them to secure a very large portion of the assets of the road still in the hands of the court for distribution, to the prejudice of creditors, who thus far have received nothing on their claims. We must hold, therefore, that the Van Wert bondholders are not entitled to be treated as unsecured creditors to the extent of a million dollars, or of any other sum, against the defendant company, or to share as such in the distribution of any further assets available for the payment of the company's debts.

The two questions which were made on the motion have thus been disposed of, but we are unable, with the showing made before us, to enter an order of distribution, because we are not advised whether the moving creditors, Schaffer et al., are the only ones entitled to share in such distribution. If they are, it will not be necessary to make the order upon the reorganization committee to pay up the deficiency in the resale. If there are others, it will

be necessary to determine the amount of their claims, and then perhaps to make the order upon the reorganization committee. There seem to be other intervening creditors than those who make this motion, and, until the validity of all the claims entitled to share in the distribution has been determined, the order cannot be entered.

Counsel may present to the court the facts material in making the proper order at Cleveland, on Monday morning, November 14th.

<hr />

### (October 4, 1893.)

TAFT, Circuit Judge.    After the filing of the foregoing opinion, the case was referred to Irvin Belford as master, to take evidence, and report upon the validity of the claims made to the fund in accordance with the principles announced in the opinion.    Notice was given to all parties interested, a hearing was had, evidence was taken, and exhibits were filed, and the master has filed his report, in which he concludes that the only creditors of the Cincinnati, Jackson & Mackinaw Railway Company who are entitled to share in the fund of $25,000 now in the registry of the court are Francis M. Schaffer, $6,139.34, with interest from October 27, 1888, at 6 per cent.; Byrd Hubbard, $253.40, with interest at 6 per cent. from May 6, 1889; Annie M. Dolan, $196.29, with interest at 6 per cent. from October 21, 1889; Charles P. Patterson, $5,689.80, with interest from February 25, 1888, at 7 per cent.; and John W. Foll, $2,444.81, with interest at 6 per cent. from December 1, 1891.    Exceptions have been filed by defeated claimants, and upon these exceptions arise the questions now to be decided.

The largest claim against the fund was presented by William Stewart Tod.    It was in the form of a judgment for $228,397.21, with interest since November 7, 1889, against the Cincinnati, Jackson & Mackinaw Railroad Company.    The facts in regard to this judgment as found by the master from the evidence are that the principal of this judgment was made up of advancements to the old company to pay interest on bonds and current liabilities by a number of the directors, or by firms in which the directors were partners.    These directors were Walston H. Brown, George F. Stone, George R. Sheldon, Richard T. Wilson, J. Kennedy Tod, C. M. McGhee, John T. Martin, Samuel Thomas, and W. T. Walters. The advancements were represented by different unsecured notes of the company made to the foregoing individuals, who, in order that the claims might all be in one person, indorsed the notes in trust and without consideration to William Stewart Tod, in whose name the judgment was taken.    When the reorganization committee was formed, it was stipulated and agreed that those who were the real owners of this judgment should stand exactly as if they were first mortgage bondholders, and the amount of bonds to be issued by the new company was increased beyond the amount of the old bonds sufficiently to allow the issues of bonds to take up, dollar for dollar, the claims aggregated in this judgment.    These

bonds have been issued by the new company, organized by the reorganization committee to the Central Trust Company, which holds the bonds subject to the order, not of the new company, which issued them, but of the reorganization committee, who are the trustees and agents for the bondholders and these judgment creditors. The new company is completely organized. It is in possession of and is running the road. The delay of the reorganization committee in distributing the bonds is caused, perhaps by this litigation, and certainly by the injunction suit to prevent the Cincinnati, Hamilton & Dayton' Railroad Company from purchasing from the reorganization committee stock of the new company, and from guarantying the bonds issued by the new company. The delivery of the bonds by the new company to the Central Trust Company to the order of the reorganization committee was a delivery to the old bondholders and these judgment creditors, for whom the reorganization committee were simply agents. On the principles announced in the opinion, this was a payment of these claims against the old company. It was a complete novation, and discharged the old company, and any fund or property remaining as its assets, from liability to pay them. The oral and documentary evidence abundantly sustains the findings of the master. Indeed, I am convinced by the evidence that there was a written agreement embodying that which the master finds to have been only a verbal agreement or understanding. The claim of William Stewart Tod as a judgment creditor to share in the distribution of the fund now in the registry of the court was rightly rejected.

A second claim made is by the reorganization committee for $20,-009.17, with interest from March 16, 1892. This claim arose from certain claims for rights of way now enjoyed by the railroad company. On a previous reference the master reported that this claim was a lien upon the corpus of the railroad prior to the first mortgage bonds. No exceptions have ever been filed to this report, which must stand confirmed. Subsequently the reorganization committee paid off this claim as a prior lien. This was obviously a mere payment, and not a purchase. It was made to clear the title for the owners by purchase of the property. Manifestly it entitles the payors to no claim against the purchase price of the property when sold subject to the lien. The master found that the claimants were not entitled to share in the distribution of the fund before the court, and this finding is sustained.

A third claim is made by the reorganization committee for $14,-000, with interest from March 10, 1892. This was based on money paid by one J. M. C. Marble for the benefit of the old company. The master, in the former reference, which, as already stated, stands unexcepted to and confirmed, reported that this money had been voluntarily paid by Marble, and could not be made the basis of a claim against the old company. If so, then, of course, it cannot share in the fund for distribution to the unpaid creditors of the old company. More than this, it now also appears that Marble

has come into the reorganization scheme, and has had his claim paid just as the old bondholders have been paid, dollar for dollar, in new bonds. The finding of the master on this claim is confirmed.

A claim was presented for and on account of the advancements made by the Cincinnati, Jackson & Mackinaw Railway Company, i. e. the newly organized company, to pay the floating indebtedness of the receiver, contracted by him for and on account of labor, material, supplies, taxes, repairs to rolling stock, and amounts due to connecting lines. The amount claimed is $44,267.79. It appears that on June 29, 1892, by an order of court on motion of the receiver, consented to by all of the parties in interest, $20,221.66 was paid out of the fund then in the registry of the court to the receiver, to pay taxes, etc., which were a lien on the road, and that the $44,-267.79 now claimed includes these $20,221.66. Why credit should not be given for this payment by order of court, and the claim reduced to $24,046.13, it is difficult to understand. The master reports that such reduction should be made, and he is clearly right.

The master further reports that this indebtedness of the receiver was incurred without especial authority of the court, and was paid by the new company rather to clear its title to property upon which the indebtedness would be a lien than as a loan to the receiver. It appears that the receiver delivered possession of the road to the new company in April, 1892, and that nothing was paid by the new company until some time after that date. I am clearly of the opinion that the new company did not pay this money as a loan to the receiver, but only for the purpose of clearing its own property from possible and probable liens. A large part—probably 40 per cent.—of this claim was for taxes which would and did constitute a lien, and the running expenses of the road during the receivership were also so regarded. It is a misnomer to call these payments by the new company loans to the receiver. They were payments for the new company's benefit, and cannot entitle it to share in the fund now to be distributed.

The claims in favor of which the master reports are founded on judgments for personal injuries and other torts arising in the operation of the road. Their validity is not attacked, and no reason is shown why they should not be paid out of the fund. No claim is presented on behalf of the holders of the income bonds referred to in the previous opinion.

There remains only to consider the claim of the receiver for his compensation. The amount claimed is $6,000 a year for two years and five months and eleven days. The claim was rejected by the master on the ground that the order of reference limited his inquiry to the "creditors" of the old Cincinnati, Jackson & Mackinaw Railroad Company. It may be that the master was right in his conclusion, because of the language of the order of reference, but, as the court is not thus restricted, it may do equity. The compensation of the receiver should be paid out of the fund realized from the corpus of the railroad, because that was a necessary and

proper expense incurred in preserving the road for its creditors. This is not denied by the holders of the claims just allowed, but they contend that the purchasers who paid for the road in bonds should be required to substitute therefor money enough to pay the expenses of the trust. The purchasers deposited $40,000 on the order of the court, and paid the remainder of the purchase price in bonds. Presumably it was supposed by the court that this sum would pay the compensation of the receiver and other expenses, for the sale was confirmed to the purchasers, and the question of the receiver's compensation and expenses continued for further consideration. In addition to the $40,000 deposited at the last sale, there was in the registry of the court the $25,000 forfeited on the first sale, which was not completed. Now, these sums would have been ample to pay all expenses and the allowed claims had not the court, with the express and written consent of the holders of the allowed claims, made an order for the payment of $20,000 and more on account of taxes, etc., already paid by the new company. As already held, this was not chargeable to the court funds, and if, by reason thereof, the fund now in court is too small to pay those consenting to the order, they cannot complain. It would be inequitable to change the terms of the sale, so long acquiesced in simply to pay interest on allowed claims whose holders have voluntarily permitted the fund to be reduced by a payment which would not have been made without their consent and against their objection. For the same reason I do not think that an order should be made on the reorganization committee to complete their first bid. In my opinion, the holders of allowed claims waived their right to interest by consenting to the payment of $20,000 out of the fund available for their claims.

The receiver is a citizen and resident of New York, and did not come to live in Ohio, where the railroad is in operation, during the period of his receivership. The immediate executive management of the road was in other hands. He is not, therefore, entitled to compensation like that usually paid railroad presidents and receivers who are the active executive heads of the going railroad, in immediate charge, and who devote all their time to the same. I think that $2,500 a year, or $6,250 in all, is ample pay for the receiver. The master will be allowed $500 as a fee, and his expenses. The remainder, after payment of such court costs as remain unpaid, will be distributed pro rata to the claims allowed by the master. This will pay the principal of these claims, and something upon the interest due.

Let a decree be entered accordingly, confirming both master's reports as modified herein.