FREEMAN et al. v. WATSON et al.

(Circuit Court of Appeals, Third Circuit. July 3, 1914. Rehearing Denied August 29, 1914.)

No. 1825.

1. RAILROADS (§ 197*)—MORTGAGE—FORECLOSURE—REORGANIZATION.

    A majority of the holders of the first mortgage bonds of a railroad corporation entered into an agreement by which a committee was appointed to adopt a plan for the reorganization of the company, with authority to employ agents, attorneys, etc., their bonds being deposited with the committee. This committee and a committee representing the holders of subsequent bonds made an agreement by which three "representatives" were appointed to represent all the parties, procure a foreclosure of the mortgage, purchase the property, organize a new corporation to which the property was to be transferred, and distribute the securities of the new company to the two committees for distribution to the bondholders. They purchased the property at a sale under a decree which provided that the purchaser might apply on the purchase price any first mortgage bonds at the amounts payable thereon out of the proceeds of the sale, and that the corporation should remain liable for any balance

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

due on the bonds. The new company was organized and its securities distributed among the bondholders of the old corporation. Upon the distribution of the proceeds of sale, holders of first mortgage bonds who did not join in the reorganization agreement objected to those who had deposited their bonds participating in the distribution until the nonassenting bondholders were paid in full, on the grounds that there was an illegal overissue of bonds, that the representatives had become the owners of such bonds, and that one of them had notice of the illegality. *Held*, that such bonds were entitled to participate in the distribution equally with the bonds not deposited, as the representatives held them merely as agents, and, while the bondholders might have agreed to surrender all claims of every kind under their bonds and take the bonds of the new company in full satisfaction thereof, the facts showed no intention to do so.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 662; Dec. Dig. § 197.*]

**2.** CORPORATIONS (§ 482*)—FORECLOSURE OF MORTGAGE—EVIDENCE.

Where, in a suit to foreclose a corporate mortgage, in which it appeared that illegality, if not fraud, attended the issue of the bonds secured thereby, the master's ruling that each bondholder must affirmatively prove his bona fide title before he could receive a dividend from the proceeds of sale was approved by the trial judge, and the case sent back to the master for a determination of the bondholders entitled to participate in the fund, a bondholder was not required to appear in person and prove his claim by his own testimony, but could establish it by the testimony of others, and might show a right to rely upon the title of a former bona fide holder.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1870, 1877–1888; Dec. Dig. § 482.*]

Appeal from the District Court of the United States for the Western District of Pennsylvania; James S. Young, Judge.

Foreclosure suit by the Fidelity Trust Company, trustee, against the Conneaut & Erie Traction Company. From a decree confirming a master's report and distributing the proceeds of the sale, Albert Edgar Freeman and others, bondholders, appeal. Affirmed.

A. E. Freeman, of Philadelphia, Pa., for appellants.

B. Franklin Pepper, of Philadelphia, Pa., for appellees.

Before BUFFINGTON, McPHERSON, and HUNT, Circuit Judges.

J. B. McPHERSON, Circuit Judge. This appeal is from a decree distributing a fund produced by a master's sale of the property of the Conneaut & Erie Traction Company. The sale was made in reorganization proceedings, under a decree foreclosing a first mortgage, and the three appellants represent bonds amounting to $14,000 that did not assent to the reorganization agreement. There is little dispute about the facts, and in the following summary we have made free use of the briefs of counsel:

[1] In 1902 the traction company issued $800,000 of bonds, secured by a first mortgage upon all of its property, including its franchises. In 1904 a second mortgage was created, securing an issue of refunding bonds. In 1907 the company defaulted, and the district court appointed a receiver. Thereupon two committees were organized, one by the first mortgage bondholders, and the other by the second mortgage

---

bondholders. The members of the first committee were William Chalfant, Jr., William J. Fling, R. L. Forrest, E. C. Miller, and C. E. Willock, and the members of the second committee were C. B. Van Nostrand, Evans R. Dick, and George S. Graham. Out of the total issue under the first mortgage, bonds to the amount of $783,500 were deposited under the terms of an agreement hereafter referred to. All of the refunding mortgage bonds were deposited with the second committee.

On May 4, 1908, the two committees agreed upon a plan of reorganization. William J. Fling and R. L. Forrest of the first committee, and C. B. Van Nostrand of the second committee, were appointed to carry it out as "representatives" of all parties to the agreement, and were so described. As part of the plan, the Fidelity Trust Company of Philadelphia, trustee under the first mortgage, filed a foreclosure bill under which a decree was entered in April, 1909. In May the property was sold to the "representatives" for $200,000, of which less than $40,000 was ultimately paid in cash, the sale was duly confirmed, and a deed was made to the purchasers. When the master attempted to distribute the fund arising from the sale, the "representatives" presented the $783,500 of deposited first mortgage bonds so that a dividend might be awarded to these bonds out of the purchase price. Thereupon a nonassenting bondholder, now one of the appellants, objected on the ground that fraud or illegality had attended the issue under the first mortgage—specifically, that an overissue had been made contrary to law—and contended that no bond should be allowed to share in the distribution until the holder thereof should assume the burden of proving that he had acquired it bona fide, for value, and without notice of the fraud or illegality. The master overruled the objection, holding that as the bonds were in the usual form, and were therefore negotiable securities, the title of the holders was presumed to be good, and that the burden of proof was upon the objector. He, therefore, distributed the fund pro rata to the "representatives" and to the nonassenting bondholders. The latter excepted, and (while the matter was pending) was joined by the other two appellants, who are also nonassenting bondholders. The District Court sustained the exceptions, directing the master to take testimony and report: (1) What was the fact concerning the asserted fraud or illegality; and (2) who were the holders and owners of the bonds, with the amounts due thereon.

Much testimony was taken, and the master reported that illegality, if not fraud, had attended the issue of the bonds, and ruled that each holder must affirmatively prove his bona fide title before he could receive a dividend. Judge Young agreed, and sent the case back in order that the master might determine "who of the bondholders are entitled to participate in the fund." By this decision the "representatives" were obliged to assume the burden of proving that each holder of the deposited first mortgage bonds had a valid title. Until this should be done, of course the "representatives" could not use any of the bonds in part payment of the $200,000 purchase money, and the transaction could not be completed. Accordingly many witnesses were heard, 136 on behalf of the depositing bondholders, and 3 on behalf of

the nondepositing bondholders. In February, 1913, the master made a careful and detailed report, finding that $695,000 of first mortgage bonds were owned and had been deposited by persons or corporations who were bona fide holders for value without notice of the fraud or illegality and finding, also, that the $14,000 of undeposited bonds were similarly owned. Accordingly he distributed the fund pro rata to the "representatives" and to the owners of the $14,000. The latter excepted, but the exceptions were dismissed and the report confirmed. The present appeal is taken from the decree of confirmation. The issue, therefore, before this court is, Who is entitled to the proceeds of the foreclosure sale, and in what amount?

The assignments of error are numerous, but they may be grouped under two propositions, which are thus stated in the brief of the appellants' counsel:

"I. That all the bonds other than those held by the appellants are owned by Messrs. Fling, Forrest, and Van Nostrand, are charged with the fraud, and are postponed in distribution to the bonds of the (appellants).

"II. That the direction of the lower court in referring this cause back to the special master required the production of the bonds and (the) present owners thereof; that no bondholders have appeared other than the appellants, and therefore only the appellants' bonds are entitled to distribution."

Or, as stated by counsel for the appellees, the receiver and the "representatives," the objections for consideration are these:

1. Because the "representatives" were held to be agents of the depositing bondholders, while they should have been held to be the holders and owners of the bonds on their own account.

2. Because each bondholder was not compelled to appear in person and prove his or her claim.

3. Because in certain instances the master accepted insufficient evidence of good faith.

4. Because in other instances the master refused to charge some of the bondholders with bad faith, overruling the appellants' contention that because these bondholders had inspected the property before buying the bonds, they should therefore be charged with notice of the following facts: (a) That the bonds had been fraudulently or illegally issued; (b) that the road was to be only 30 miles in length instead of 35, the mortgage indicating the larger number; and (c) that a certain branch was not being built, the mortgage indicating also that this branch would be built as part of the mortgaged property.

The appellants' principal argument seems to be that, although the first committee was the agent of the depositing bondholders, and although the "representatives" were the agents of both committees, nevertheless the agency had ceased because the "representatives" had discharged all their duties; the result being that in some undefined manner the "representatives" have become the sole owners of the deposited bonds. If they are the owners, it is further argued that the bonds must be postponed to the appellants' nonassenting bonds, which must then be paid in full, because Forrest, one of the "representatives," was president of the traction company when the bonds were issued, and had notice of the fraud or illegality.

We do not agree with this argument, and we think its unsoundness will appear upon further consideration. The committees will be called No. 1 and No. 2. The agreement under which No. 1 was appointed is in brief as follows: The bondholders appointed the committee with power to adopt a plan of reorganization, and agreed to be bound thereby. They authorized the committee to employ agents, attorneys, etc., and to buy all the traction company's property of every kind at public or private sale, giving further power to assess the bondholders in order to raise the necessary funds for all purposes. The committee was to be free from personal liability except for fraudulent misconduct.

Under this agreement committee No. 1 were undoubtedly the mere agents of the depositing bondholders in the reorganization of the road, with the powers and under the conditions stated by their principals. These powers authorized the committee to make the reorganization agreement with committee No. 2. By that agreement Fling, Forrest, and Van Nostrand became the "representatives" or agents of both sets of bondholders, Fling and Forrest being also members of committee No. 1, and Van Nostrand, of committee No. 2. The agreement declared that the three persons named should be "representatives of all parties hereto (meaning both committees acting for the two sets of bondholders) with authority to take the steps and perform the acts hereinafter specified." In outline the steps to be taken were as follows: The Fidelity Trust Company was to be asked to foreclose the first mortgage, and the "representatives" were to agree upon a minimum price for the property and upon other terms of sale, and were authorized to buy the property if necessary. Committee No. 1 was to furnish in the first instance the cash needed to comply with the terms of sale, and was also to place the bonds in its hands at the disposal of the "representatives" to enable the purchase to be completed. The "representatives" were then to organize a new corporation, to be styled the Cleveland & Erie Railway Company, and were to transfer the property to such corporation, taking the needful steps to have the receiver discharged and to gain possession of the property. The new company was to issue securities of the nature and in the amounts set forth, these new securities to be distributed to the two committees in certain proportions, and the two committees were to distribute the securities in exchange for the bonds deposited with them. The "representatives" were to be free from personal liability; all obligations assumed by them being declared to be assumed "in their representative capacity and not as individuals."

This agreement emphasizes the agency of the "representatives"; they were clearly acting not as owners of the bonds, but merely as agents of the two committees and of the depositing bondholders for the purpose of completing the reorganization. It is not quite easy to understand the ground for the appellants' contention that the assenting bondholders ceased to own the deposited securities, and that the title thereto passed to the "representatives." On the surface it would seem that the transaction presents the case of an ordinary reorganization, of the type referred to in Cook on Corporations, sections 886 and 887. We can dis-

cover nothing to the contrary, either in the agreements or in the foreclosure decree. The situation was this:

Under the decree of foreclosure the first mortgage bondholders were obliged to bid at least $200,000. If they should become the purchasers, $30,000 of this sum was to be paid in cash, in order to meet the expenses of sale and certain preferred claims. (This amount was afterwards increased to nearly $40,000.) Of course the balance of the bid was applicable to the debts of the traction company in their order, and this meant that the whole balance would go to these bondholders. But as they were allowed to use their bonds in payment, they were not obliged to go through the superfluous formality of paying the remaining $170,000 with one hand and taking it back with the other. The mere presentation of valid bonds would be sufficient. The master's principal inquiry therefore was, How many bonds are valid? And with this inquiry his report is mainly concerned. All bondholders, assenting and nonassenting alike, were interested in this question—especially the nonassenting holders, since they were to receive in cash whatever their proper proportion might be. But, as the assenting bondholders had to find the money to pay the nonassenting holders, they were also interested, since the proportion awarded to them would relieve them pro tanto of the obligation to furnish actual money. This was a real advantage, and while, no doubt, they might agree to give it up if they chose, such an agreement would be unusual and would scarcely be presumed. The agreements looking to a reorganization were made in 1908, and the decree which was entered in April, 1909, may fairly be regarded as expressing the intention of the persons in interest:

"That at said sale no bid shall be received for the property unless the person making such bid shall have previously deposited with the said master a certified check to his order for the sum of $30,000. The balance of the purchase price shall be paid to said master upon the delivery of a deed conveying the property to the purchaser. The purchaser, for the purpose of making settlement or payment for the property, shall be entitled to apply toward the payment of the purchase price any first mortgage bonds and any matured and unpaid coupons at the amounts payable thereon out of the net proceeds of the sale, the master being empowered for such purpose to estimate and determine said amounts. The master is not authorized and shall not accept at such sale any bid of less than $200,000. * * *

"The balance, after paying the costs and expenses of the sale, shall be equally distributed among the holders of the first mortgage 5 per cent. gold bonds of the Conneaut & Erie Traction Company, and if any balance remain after paying in full the said bonds and coupons, with the interest due thereon, it shall be paid to the Conneaut & Erie Traction Company."

And there is a further provision that the traction company shall be bound for "any deficiency that may remain due and payable upon (the first mortgage bonds) after applying thereto all of the moneys realized from the sale applicable thereto."

Here are positive provisions that if the first mortgage bondholders buy the property they may use their bonds toward paying the purchase price, and that the company is to be bound for any deficiency after charging the purchase price against the bonds. Now, it is true that in spite of the decree the bondholders might have agreed to surrender all claims of every kind under their bonds in case they should become the

purchasers, and they might have agreed to take in full satisfaction thereof the bonds of the new company. If they made such an agreement, they are bound by it; and in a reported decision, on which the appellants mainly rely (Central Trust Co. v. Cincinnati, etc., Co. [C. C. Ohio] 58 Fed. 500), the bondholders apparently did so agree, and Judge Taft enforced the contract. The principal resemblance between that case and this lies in the fact that in both cases the reorganized company issued new securities that were accepted by the bondholders under the old mortgage. But the Ohio decision rests upon the peculiar equities there appearing, as is shown by Judge Cochran in McEwen v. Land Co., 138 Fed. 797, 17 C. C. A. 163, so that the reasoning of Judge Taft should be regarded as applicable to the special circumstances then before him.

We have here the case of an ordinary reorganization that has been partly carried out. The property has been conveyed to the new company, and the "representatives" have taken the risk of distributing the securities of the new company among the bondholders of the old. The risk may not have been serious, but it seems plain that the transaction has not yet been completed, and that the agency has not yet come to an end. The receiver has not yet been discharged, the fund arising from the sale has not yet been distributed, and the ultimate liabilities of the first mortgage bondholders have not yet been determined. The distribution is precisely the matter now in dispute, so that the purpose for which the committees and the "representatives" were appointed has not yet been fully carried out. The deposited bonds are still needed to discharge a part of the purchase price, and no sufficient ground appears in the reorganization agreement to justify us in holding that the bondholders intended to surrender their bonds with all valid claims thereunder upon the proceeds of sale, and to take the securities of the new company in full satisfaction. Some clear expression, or some definite implication, should exist before so unusual a result is reached, and we find neither in the present transaction. On the contrary, the agreement distinctly recognizes that the bonds may be used for the very end to which they are now being put, and there are no opposing equities to compel a different conclusion. We say nothing of other difficulties that might lie in the appellants' road, even if the bondholders had plainly abandoned all claim under their old bonds. The other branch of the appellants' first proposition would still require consideration, namely, that the "representatives" have somehow succeeded to the bondholders' title; and this is a subject we need not discuss.

[2] All the questions under the appellants' second proposition have to do with the competency or the sufficiency of the evidence offered to prove the titles of certain bondholders, and the full discussion by the master, approved by the district court, relieves us from the need of taking up the appellants' objections in detail. It is enough to say that it was not obligatory upon each bondholder to appear in person and to prove his claim by his own testimony. He was only obliged to offer competent and sufficient evidence for this purpose, and such evidence might proceed from other persons as well as from himself. So, too, he might show that he was at liberty to rely upon the title of a former

bona fide holder for value without notice. The evidence offered sat-
isfied the master and the district court, and we should be slow to reject
findings of fact on which they agreed.

The decree is affirmed.