LURTOts, Circuit Judge,
after making the foregoing statement of facts, delivered the opinion of the court.
Before considering the merits, there is a preliminary question for consideration, involving the jurisdiction of the circuit court to pronounce any decree in this cause. The jurisdiction of the court seems never to have been brought to the notice of the court below until after an amended and supplemental bill had been filed by complainant, and the cause about ready for hearing. In considering this question of jurisdiction, we shall therefore consider the status of the cause as it appears upon both the original and amended bills. If the court had jurisdiction at the time a motion was first made to dismiss for want of jurisdiction, and had jurisdiction when it entered the decrees appealed from, it is of no moment, on this record, how long it fiad had jurisdiction, or at what prior stage of the cause it was acquired. In Railroad v. Ketchum, 101 U. S. 289-298, a like objection was made at a. late' stage of the cause, and the court said:
“For tbe purposes of this appeal, we need not inquire when the circuit court first got jurisdiction of this suit. It is sufficient if it had jurisdiction when the decree appealed from was rendered. As no objections were made by the parties in the progress of the cause to the right of the court to proceed, and the decree, when rendered, .was consented to, it is enough for the purpose of this appeal if the record shows that, when the consent was acted on by the court, jurisdiction was complete. Consent cannot give the courts of the United States jurisdiction, but it may bind the parties, and waive previous errors, if, when the court acts, jurisdiction has been obtained.”
The sole complainant in the original bill was the Badford Trust Company, a corporation of the state of Virginia. The defendants were all citizens of the state of Tennessee, or of states other than Virginia. One of these defendants was R. M. Barton, Jr., who was made a defendant as trustee under the mortgage securing the bonds issued by the Hughes Lumber Company, which was a corporation of the state of Tennessee. Barton, the trustee, was also a citizen of Tennessee. The appellants now insist very strenuously that Barton, as trustee, should, for purposes of jurisdiction, be classed on the same *573 side of the controversy as the complainant, and that, when the parries are thus arranged, we will have a cause where citizens oí Tennessee are upon both sides of the case, and the jurisdiction of the circuit court must therefore fail. Where the jurisdiction of the United íátates court is dependent alone upon diversity of citizenship, the parties should he arranged with reference to the real controversy presented by the pleadings, and not according to the arbitrary arrangement of the pleader. This is well settled in the adjudica cions of this court. Pittsburgh, C. & St. L. Ry. Co. v. Baltimore & C. R. Co., 22 U. S. App. 359-366, 10 C. C. A. 20, and 61 Fed. 705; Shipp v. Williams, 22 U. S. App. 380-385, 10 C. C. A. 247, and 62 Fed. 4; Salt Co. v. Brigel, 31 U. S. App. 666, 14 C. C. A. 577, and 67 Fed. 625. Bnt what is the subject-matter of the real controversy presented by the original and amended bills of the complainant? In Railroad v. Ketchum, 101 U. S. 289, the court said, touching this classification of the parties with reference to the real controversy, that:
“For the purpose of jurisdiction, the court had power to ascertain the real matter in dispute, and arrange the parties on one side or the other of that dispute. If, in such arrangement, it appeared that those on one side were all citizens of different states from those on the other, jurisdiction might be entertained, and the cause proceeded with.”
In the case last cited the bill was a foreclosure suit brought by Ketchum, a holder of bonds, against the mortgagor and the trustees under the mortgage. The comjfiainant and the trustees thus made defendants were citizens of the state of Slew Toril. The mortgagor was a corporation of Missouri, and the suit was brought in one of the circuit courts of the United States for the Eastern district of Missouri. The jurisdiction was wholly dependent, upon all the parties on one side of the controversy being citizens of different states from those on the other. As the parties were arranged by the pleader, this diversity did not exist, and there was no jurisdiction. It appeared, however, that the trustees were necessary parties, because the legal title to the mortgaged property was in them, and they were made defendants because, doubting their authority, they had declined to institute foreclosure proceedings. There were no averments in the bill indicating any antagonism between the trustees and the beneficiaries under the mortgages. “The complainants,” said the court, “commenced the suit to get done just what the trustees, if they had been willing to proceed, might have done- Whatever he did was for the trustees, and in their behalf, and he really had no power to do more than they might have done if they had been so inclined.” The court therefore held that there was no antagonism between the complainant and the trustees, who should therefore be arranged on the same side of the real dispute with the complainants, which gave juris» diction and enabled the court to proceed with the cause. The aver-inent of the amended bill touching the refusal of Barton to foreclose the mortgage made to him was in these words:
“R. M. Barton, .Tr., the trustee, not only declined and neglected to advertise and sell the property covered by said trust deed, but complainant avers that he had definitely and positively determined and declined to join as a party bringing said suit; that he had in fact, for reasons personal to himself, and having- no reference to this cause, or to giving this court jurisdiction thereof, *574 positively and definitely determined not to execute the trust, and to have nothing to do as trustee with the matters and trusts created by said deed; that he had reached this determination before he was aware that this suit would be brought, and before his connection therewith; that he did this, not for the purpose of giving this court jurisdiction, but that this conduct would have been the same under any and all circumstances, and, as before stated, for reasons personal to said trustee, and which were, in his judgment, imperative, and conclusive on him.”
If the only object of complainant’s bill had been to foreclose the Barton mortgage, such an averment as to the reasons moving Barton in his refusal to institute such a proceeding would be insufficient fo show any real antagonism between the complainant and himself as trustee, and would bring the case within the facts of Railroad v. Ketchum and Shipp v. Williams, elsewhere cited, and require that the complainant and Barton should be treated as on the same side of the real controversy, which, in the case supposed, would have been the mere question of the' foreclosure of the mortgage, — a controversy wholly with the mortgagor. But complainant’s bill, as amended, was not a simple foreclosure bill. It was full of averments attacking the right of any beneficiaries thereunder, save itself, to share in the benefits of the common security; alleging that, with the consent of all other holders of bonds, the mortgaged property had been conveyed to another newly-organized corporation, and bonds of this new corporatioii, secured by a mortgage on same property, accepted in exchange for those secured by the conveyance to Barton. These averments involved a dispute as to the right of Barton to foreclose the mortgage for the benefit of any beneficiary other than complainant, and involved an insistence that if he did foreclose, or if foreclosure should result from judicial proceedings, the proceeds arising from the sale of the mortgaged property should be paid exclusively to complainant, to the extent necessary to satisfy its bonds. Thus, the controversy was not only as to the foreclosure of the mortgage, but as to the right of complainant to be paid to the exclusion of all others. Clearly, this was a dispute in which Barton, as trustee for all beneficiaries, must stand in antagonism to the exclusive claim set up by a single beneficiary, and should not be treated as upon the same side. The bill was not one which could have been properly prosecuted by him, and complainant cannot be said to be doing just what Barton might have done had he been willing to proceed, nor that what complainant did by filing such a bill was done for the trustee and in his behalf, hi either was the liability of the mortgagor to the complainant unquestioned, for it appears that its right to hold the bonds in its possession, or to proceed against the mortgaged property for their satisfaction, was also disputed. If this contention of the mortgagor should be sustained, the mortgage was satisfied, and the trustee had no power to foreclose. To a bill filed for the purpose of preventing all other holders of bonds from participating in the benefits of a common security, and for the purpose of establishing complainant’s right to the bonds it held, and of procuring a decree appropriating that security to its exclusive benefit, the trustee was a necessary party defendant. Though the trustee thus made defendant may have been under no duty to actively participate in a controversy *575 between beneficiaries, jet Ids attitude was properly that of a defendant whose right to execute the trust for the equal benefit of all was denied, and made a subject of judicial controversy. Appellants have called attention to the fact that Barton is one of the counsel filing this bill, and this, they say, evidences his friendly attitude to complainant. Barton’s attitude as counsel for complainant is clearly one of active antagonism to the rights claimed by all the other beneficiaries, and is one which he could not have assumed in his character as trustee. He was acting with proper judgment in refusing, as trustee, to champion the claims which he may well present, as counsel, after throwing off the responsibilities of trustee.
We come now to the merits of the cause. The principal question arises upon the error assigned to so much of the decree as excludes the First National Bank of ‘Chattanooga and G-. 11. Jam agin, assignee of the City Savings Bank of Chattanooga, fr.om participating in the proceeds arising from a foreclosure of the mortgage to Barton. Both of the appellants who complain of this part of the decree were large creditors of the Hughes Lumber Company and of D. W. Hughes. The national Bank held, as collateral security for its debts, bonds of the Hughes Lumber Company aggregating f>75,000; and the City Savings Bank, for a like purpose, held bonds amounting to $50,000. In the creation and management of these large debts, the National Bank was represented by its president, T. G-. Montague, and the City Savings Bank by its cashier, O. E. Stivers. The Hughes Lumber Company was largely owned by its president, 1). W. Hughes, who seems to have involved his personal credit in its business, and to have completely controlled the affairs of the corporation. Alter the execution of the Barton mortgage, and after the general assignments of both the corporation and D. W. Hughes to Ward, as assignee, Hughes made a struggle to extricate himself and Ms corporation, by the scheme of organizing a new corporation, which should take all the property of the old, and all of Ms individual estate, and assume all liabilities of himself, as well as of the Hughes Lumber Company. He believed, as did many of thé creditors, that the combined property of the corporation and himself would furnish ample security for an issue of $250,000 in bonds, and that these bonds would be accepted by the holders of the Barton bonds, and other creditors who had only the security afforded by the assignments to Ward in satisfaction of their debts. A meeting of creditors was accordingly held, and this scheme was indorsed. A circular letter was signed by Montague and by Stivers, representing these two banks, and by several other creditors, and was sent to such creditors as had not been present, soliciting their assent to the plan. The great mass of creditors did assent, and agreed to accept the new bonds in satisfaction of their claims, and to surrender the security afforded by the Barton mortgage, and by the assignments to Ward. But before all had assented the new corporation was organized, and Ward, through the active co-operation of these two banks and others, was induced to convey the assets vested in him to the new company. This conveyance was not joined in by Barton, and was therefore subject to the lien of his mortgage, upon the real estate and machinery of the Hughes Lumber Company. *576 A mortgage was placed or the property thus obtained, and the bonds of the new corporation issued, to the extent of $250,000. Those bonds were at once offered to the creditors of the old company and of D. W. Hughes in substitution for the securities they held, and were accepted by many unconditionally. When Hughes sought to obtain from these two banks the Barton bonds held by them, and to substitute for them the bonds of the new corporation, he was met by the demand that all other holders of such bonds must first agree to the plan of settlement, and that the Barton mortgage should be canceled. To meet this difficulty, it was agreed that the banks should take the new bonds conditionally; the condition being that the old bonds should be retained until all other holders of such bonds had agreed to accept the new security, and the Barton mortgage had been canceled.
It has been argued that these new bonds were accepted and received only as additional security to that afforded by the Barton mortgage and by the assignments to Ward, and were to be received in substitution for the old security only when all beneficiaries had accepted the plan of settlement, and when the Barton mortgage had been canceled, and that they are entitled to the benefit of both securities, the condition upon which they were to surrender one never having been performed. This contention is not supported by the facts and circumstances found in this record, nor can we believe that either Mr. Montague, who acted for the National Bank, or Mr. Stivers, whc represented the Savings Bank, mean to have their evidence interpreted as supporting - such a proposition. That these appellants should, under any circumstances, obtain an additional security to that afforded them by the Barton mortgage and the Ward deeds of trust, except upon condition that they should surrender the Barton bonds and the benefit of the Ward assignments, is utterly inconsistent with the whole scheme of settlement which had been presented by them. That they were unwilling to give up the Barton bonds until others had done so is quite reasonable. But it is equally clear that, until they did agree to surrender the Barton bonds, they could obtain no title to the bonds of the new corporation. A consideration of the whole evidence leads us to the conclusion that each of these banks accepted these new securities as a substitute for the old bonds, subject to the condition that all other holders of the old issue of bonds should agree to a like exchange of securities, and that the old or Barton bonds were retained until this condition had been complied with. These were the facts as reported by Special Master Ewing, and were the facts as found by the court below.
The document signed by D. W. Hughes under date of June 1, 1891, pledging, among other collaterals, 48 of the bonds of the Hughes Bros. Manufacturing Company to the City Savings Bank to secure the indebtedness which had been theretofore secured by the bonds of the Hughes Lumber Company and other collaterals, is not hostile to this conclusion. The indebtedness secured by the pledge of June 1, 1891, were the same debts theretofore secured by a pledge of the bonds of the Hughes Lumber Company, together with certain shares of stock in an electric lighting company, and by certain notes secured *577 by a deed of trust upon tlie individual property of D. W. Hughes. The instrument by which Hughes pledged the bonds of the new corporation also included the shares and notes before pledged, and makes no mention of the old bonds which had been held in pledge theretofore. A fair inference from this omission to pledge the old bonds would be that the new bonds were substituted for the old, the pledge in other respects being identical with the former security held by that bank. The fact that the old bonds were suffered to remain in the possession of the bank after this new pledge alone supports the conclusion that the new bonds were not accepted unconditionally. The condition upon which these hanks were to accept the new bonds in exchange for the old has never been complied with. One holder of such bonds never did' accept the new bonds, and that holder is the complainant Unless, therefore, these banks which took the bonds conditionally have done something to change their situation, they may well stand upon their rights as holders of the Hartón bonds, and participate with complainant in the proceeds of a foreclosure; for they have obtained no title to the new bonds, and no right to retain them. Clearly, appellants had the power to waive this condition, and might do so by any act which clearly indicated an election to hold and enforce the new bonds. They could not hold both classes of bonds, and could not enforce one mortgage without abandoning the other. While appellants were thus in possession of both sets of bonds, with the right to determine which they would rely upon, the complainant filed its original bill. That bill had for its principal object, as we have heretofore stated, the foreclosure of this Barton mortgage for the exclusive benefit of such holders of bonds as had not elected to accept the bonds of the new corporation in satisfaction thereof, and alleged, on information and belief, that all holders of such bonds, other than complainant, had elected to receive bonds of the new company in satisfaction of their claims. This bill was filed July 4, 1892. On the 1st day of September, 1893, the holders of the bonds issued by the Hughes Bros. Manufacturing Company joined, under a provision of the Beck mortgage, in a declaration maturing the principal of said bonds for nonpayment of interest, and requiring H. G. Beck, the trustee, to take steps at once to foreclose. This instrument was signed by both these appellants, and was duly delivered to the trustee. On the 20th of September, 1893, the First National Bank filed an original bill in a chancery court of the state against the Hughes Bros. Manufacturing Company and H. 0. Beck, trustee, for the purpose of foreclosing the mortgage to Beck for the benefit of all holders of bonds secured thereunder. Upon the same day a bill was filed in the same court by Jarnagin, assignee for the City Savings Bank, to foreclose both the mortgages to Barton and Beck; claiming priority for the former, but praying to be allowed the benefits of the latter in case the court should determine that complainant was not entitled to claim under the Barton mortgage. As this last-mentioned bill sought only alternative relief under the Beck mortgage, we do not attach importance to it as evidence of an election to hold the bonds of tbe Hughes Bros. Manufacturing Company. *578 No clearer evidence of an intention to claim under the Beck mortgage and as a holder of the bonds of the Hughes Bros. Manufacturing Company could be imagined than was evidenced by joining in the declaration maturing the principal of those bonds, and requiring the trustee to institute foreclosure proceedings. It was an act to which no doubtful meaning could be attached, and was a distinct election to accept the new bonds and surrender the old. It was an assent and an acceptance utterly inconsistent with the subsequent retention of the old bonds, for the title of both banks to the new bonds was dependent upon the surrender of the old bonds, for which they were a substitute. For appellants it is said that this acceptance was made under mistake of fact, and that it was done under the belief that all other holders of old bonds had accepted the new. There is no evidence that they were misled, and no satisfactory evidence that they acted under any mistake of fact, or that they were ignorant of the refusal of the Radford Trust Company to accept the new bonds. It is true that neither of these banks had then been made parties to the bill of complainant, but that bill was pending in a court of record, and the Hughes Lumber Company and Barton, as trustee, were parties. That they were actually ignorant of the pendency of that bill is not affirmatively alleged or shown, and the circumstances were such that the slightest inquiry of the trustee would have resulted in full information. The legal effect of acceptance was known to them, and they are not to be now excused upon the mere suggestion that they acted in ignorance of the attitude of the complainant. The subsequent filing of a bill to foreclose the Beck mortgage by the national bank is only further evidence of acceptance, though the declaration of maturity, with notice to Beck, was in itself conclusive of that fact. Under the circumstances under which appellants held possession of these bonds, they were put to an election. They were obliged to affirm or dis-affirm the plan of settlement. They knew all the facts touching that settlement, and it rested with them to determine whether they would accept the new bonds or hold on to the old. The notice to Beck was a conclusive exercise of the right of election, and a waiver of all right to look to the Barton mortgage, or to hold on to the Barton bonds. This election to hold and rely upon the bonds of the Hughes Bros. Manufacturing Company as a substitute for the bonds of the Hughes Lumber Company operated as a payment of the latter bonds, and a release of the security provided by the Barton mortgage. Central Trust Co. v. Cincinnati, J. & M. Ry. Co., 58 Fed. 500. The case of Robb v. Vos, 155 U. S. 13, 15 Sup. Ct. 4, is a case where, under circumstances of much greater hardship, a party was held to the consequences of an election. The principles upon which that case rests are those which govern this. Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 435-470, 6 Sup. Ct. 809, also presents a case of the acceptance of bonds secured under a junior mortgage in substitution for bonds issued under an earlier mortgage, where the court held that acceptance worked a cancellation of the earlier mortgage, and held the parties to their agreement. The decree, in this respect, must be affirmed.
*579 The next question is as to so much of the decree as required appellants to pay to the receiver the sum of $11,889.57, being the amount of the bid made by them, through J. F. Loomis, at the sale by Ward, assignee, of lumber and material included in the general assignment made by the Hughes Lumber Company. As before stated, this material was not covered by the Barton mortgage, and its proceeds were properly distributable among all the creditors of the assignors. The facts show that appellants, through Loomis, as their agent, became the absolute purchasers of - this lumber, etc., at the price of $11,889.57. Loomis says that their understanding with him was that, if the creditors all agreed to the plan of reorganization, the purchase should inure to the equal benefit of all, and the material in that event would be transferred to the new corporation. If that pian fell through, then he says he was to manage the transaction for the exclusive benefit of those he represented. It is evident that, if all interested under this deed of assignment had agreed to accept the proposed arrangement, there would have been no necessity for paying the price of ibis lumber to Ward or any one else. The acceptance of the obligations of the new corporation in substitution of the benefits provided by this assignment would have operated as a release and satisfaction of this deed of trust. In that event the payment of the price to Ward, and receiving it back again, would have been an idle ceremony. But neither Ward nor appellants waited the acceptance of this plan by all. Upon the supposition that all would assent to the plan. Ward, by direction of D. W. Hughes and appellants, turned this lumber and material over to the new corpora tion, or to Hughes for the new corporation, without requiring the payment of the purchase money, and without any other consideration than the supposed consent of all concerned. We have already stated the character of the relief sought by the amended bill of the Radford Trust Company by reason of this state of facts. After the appointment of G. E. ¡Stivers as permanent receiver under the bill and amended bill of that corporation, the Eogersville National Bank, a large general creditor of both the Hughes Lumber Company and D. W. Hughes, and one of the defendants brought in by the amended bill of the Radford Trust Company, filed a petition and cross bill in the principal cause, in which, by permission of the court, the receiver joined, setting out the facts concerning this sale of lumber by Ward, and seeking relief on account thereof against Ward personally, and against J. F. Loomis and appellants by reason of their participation with Ward in a breach of trust. Upon all the pleadings and proof, the court below held Ward liable "to account to the nonassenting creditors of the Hughes Lumber Company for the price of the property sold by him for which the purchasers had not paid.” but also held that appellants, as purchasers, should he first liable, and Ward only in the event the purchase price was not paid by them. The court further held that the fund thus realized should be distributed among the creditors secured by the assignment of the Hughes Lumber Company who had not accepted the bonds of the Hughes Bros. Manufacturing Company in payment of the claims against the original corporation. We see no error in this decree of which appellants *580 can complain. They bought this property at the public sale held by Ward as assignee. They agreed to pay for it the sum of $11,889.57. They have not done so. In reliance upon the supposed willingness of all parties interested, they have suffered the property to pass into the possession of the Hughes Bros. Manufacturing Company. That company has used it up, or otherwise disposed of it. It cannot now be recovered by Ward, or by the creditors entitled to it. That appellants did this in reliance that all parties would accept the bonds of the new corporation for their debts, and thus release the assignee from liability to account for the trust assets, is no defense as against the demands of creditor's who did not waive their rights under the assignment to Ward. The liability of appellants for the price agreed to be paid is clear. This purchase price, or the proceeds of the sale, stands in the place of the property assigned, and is properly distributable among such creditors as have not waived their right to enforce this assignment. The great majority of the creditors secured under this general assignment have accepted the bonds of the new corporation, and rely upon the mortgage made by the new corporation as a substitute for the Barton mortgage and the assignment to Ward. They thereby elected to take a security inconsistent with that first provided. The effect of this exchange of obligations and securities was to release this assignment, as far as they were interested therein. This left it in force, however, as to all who refused to accept the plan of settlement. The principle involved is precisely that which controlled the decision in regard to the release of the Barton mortgage. There is no room for distinguishing between the effect of such an election as a release of the assignment to Ward, and an election on like facts which we hold to operate as a release of the Barton mortgage. Complainants now hold the bonds of the Hughes Bros. Manufacturing Company, secured by a mortgage upon its plant and realty, as security for the payment of their debts. The acceptance of these bonds operated as a release of the assignment to Ward, as well as a release of the mortgage to Barton. The suggestion that appellants are entitled to relief as against the Hughes Bros. Manufacturing Company, and to priority of satisfaction out of the mortgaged property of that corporation, by reason of its use of this lumber without paying for same, is a question not made in any pleading, or raised by any assignment of error. Touching it we express no opinion, as it should not be decided until presented in some proper pleading, to the end that other creditors of that corporation may be heard. The decree of the circuit court must be affirmed.